the paper out of the trust, and to continue that trust as to two-thirds of the paper, and of the money in bank and trust company, without disturbing the proportions of ultimate disposition made of the paper and the money; that is, that James, in addition to his absolute one-third, is to have so much of the property at the termination of the trust as will afford to him one-half of the paper and one-half of the money. This would afford to him at the termination of the trust one-sixth of the money and one-sixth of the paper, in addition to the one-third, or two-sixths, already given to him. There is strong reason for this construction in the fact that if the final scheme of the testator is changed by the codicil, so as to give James the one-third only that was to vest in him at the death of the testator, then such scheme fails to make disposition of the entire estate, for it would dispose of but the one-third given to James and the one-half given to the other children at the termination of the trust. There is nothing in the will or codicil, or in will and codicil, which would justify an increase of the share given to the children, exclusive of James, by the addition of the said one-sixth undisposed of. I am of opinion, then, that the judgment should be modified, so as to give one-half interest to the children, exclusive of James, at the termination of the trust, and one-sixth to James at that time, and one-third also to James absolutely at the death of the testator. It would follow that but two-thirds was subject to the sale ordered and directed by the court, inasmuch as the one-third was vested absolutely in James at the death of the testator.

The judgment should be modified in accordance with this opinion, and, as so modified, affirmed, with costs to all parties to this appeal, payable out of the trust fund. All concur.

GOODRICH, P. J., votes for affirmance, on the ground that the provision in the codicil for James M. Heatherton was intended by the testator as a substitution for the provision made for him in the will.

———

(65 App. Div. 546.)

## MURPHY v. CONEY ISLAND & B. R. CO.

(Supreme Court, Appellate Division, Second Department. November 22, 1901.)

MASTER AND SERVANT—INJURY TO SERVANT—IMPROPER APPLIANCES.

> Plaintiff was employed as a lineman by defendant, and while fastening a charged span wire into an insulated coupling, which proved defective, received an electric shock. It was not shown that the defendant had made any test of the coupling, though it was practicable to make such tests, but the defendant's president testified that all the couplings were purchased from a respectable manufacturer, who had agreed to make an inspection in the factory before delivery. *Held* sufficient to go to the jury on the question of whether reasonably safe appliances had been furnished by the defendant.

Appeal from trial term, Kings county.

Action by James Murphy against the Coney Island & Brooklyn Railroad Company. From a judgment in favor of defendant, plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, WOOD-WARD, HIRSCHBERG, and JENKS, JJ.

Frederick E. Crane, for appellant.
William N. Dykman, for respondent.

JENKS, J. At the time of the accident the plaintiff was defendant's lineman, at work on the reconstruction of defendant's electric traction system of overhead wires. He stood upon a ladder, near the top of one of its upright iron poles, engaged in fastening span wires into a "brookline" or turn-buckle which was attached to the pole. The defendant's span wires were stretched across the street from pole to pole in support of the feed wire, which ran through the center of the street, parallel with the tracks. The span wires, when in contact with the feed wire, were charged with electric current, and the brookline was an insulator to stop the flow of current from the span wires into the iron poles. The brookline is a metal appliance, eight or ten inches long. It consists first of a spool (ending in a ring) filled with mica, or with mica and asbestus; then a tube covered with insulating material is set into the spool; and finally an eyebolt, working freely, screws into the spool. The span wires are connected with the brookline, and in the work it was necessary to lift up the brookline as it hung from the top of the iron pole, and to pass the span wires through the eyebolt. The plaintiff lifted the brookline by the eyebolt, then took hold of the span wires, and therefrom received a severe shock of electricity. Subsequent to the accident it was found that the brookline had leaked, and thereby had become defective. There was no evidence that the defect was visible. It was not contended by the defendant that it had made any inspection of the brookline at any time. But its president testified that the defendant had purchased all of its brooklines from a respectable manufacturer, who had agreed to make an inspection in the factory before delivery to the defendant, and that the defendant in its subsequent use of these brooklines relied upon that promise. At the close of the testimony the learned trial justice held that there was not sufficient preponderance of any violation of duty upon the part of the defendant to justify a verdict, and that as the defendant had bought the brooklines from a reputable manufacturer, who assumed the duty of inspection, the defendant was not negligent in failing to make another test. We think that the learned court erred. The obligation of the defendant was to furnish to its employés good and suitable appliances, and to use reasonable care to keep them so. Byrne v. Eastman Co. of New York, 163 N. Y. 461, 57 N. E. 738. The master's duty in choosing materials for his servants is to use care similar to that which a man of ordinary prudence in similar business, acting for his own safety, would use in choosing such materials for himself, were he doing the work. The rule is the same whether the master buy the appliance ready-made, cause it to be made, or purchase the materials and make it. Carlson v. Bridge Co., 132 N. Y. 273, 30 N. E. 750. We think that the learned court erred in holding, as matter of law, that the

defendant had shown a discharge of its obligation to its servant. Of course, we do not hold that the obligation upon the master requires him always to inspect appliances, so that proof of omission to inspect is proof of negligence. But there are two features in the testimony in this case which, in our opinion, made the question one for the jury: First. There is no proof whatever that the manufacturer ever made any tests of the brooklines. The testimony only goes to show that the manufacturer made a verbal promise that he would test them. Second. There is testimony that practicable tests could be made by the defendant of the brookline in its finished form, which would have revealed the defect in question, and that the defect was not inherent in the material of construction, but was due to a leakage from the appliance. Therefore a discrimination may be made between this case and a case like Carlson v. Bridge Co., supra. In the Carlson Case there was proof of tests made in the manufacture of the material sold to the master; the defect complained of was inherent in the material; and the only tests which could have been made by the master after purchase were those which were appropriate to the process of manufacture, and impracticable, except that the appliance was impaired or destroyed. In Flood v. Telegraph Co., 131 N. Y. 603, 30 N. E. 196, cited by the learned counsel for the appellant, the court say that the cross arms on telegraph poles manifestly were not intended to bear the whole weight of any person. In the case at bar the very purpose of the brookline was insulation; the plaintiff, in the work, was compelled to handle it; and the injury was due to its failure as an insulation. In the Flood Case the court say that there was no negligence in furnishing and putting up the arm originally. The question in this case is whether the master used due care in furnishing the brookline. In the Flood Case the court say that there was a system of inspection for the arms when purchased. In the case at bar there is a total failure of proof of inspection at any time by either maker or master. In the Flood Case the court say that the defendant also had a system of inspection that was all that was practicable. In the case at bar there is testimony tending to show that inspection was practicable, but there is no proof that any inspection was ever made. In the Flood Case the court say that the plaintiff knew that he must rely upon his own judgment in placing his weight upon the arm, which the court theretofore had said was not intended to bear the whole weight of any person. In the case at bar it was necessary for the plaintiff to connect the brookline with the span wires, and he had a right to rely upon the fact that the master had used due care in furnishing an apparatus the very purpose of which was insulation. We express no opinion as to the liability of the defendant, but reverse the judgment upon the ground that the testimony required the submission of the case to the jury.

Judgment reversed and new trial granted; costs to abide the event. All concur.